# 22-0047-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

DRESSER-RAND COMPANY,

*Plaintiff-Appellee,*

– v. –

PETROLEOS DE VENEZUELA, S.A.,

*Defendant-Appellant,*

PDVSA PETROLEO, S.A.,

*Defendant,*

RED TREE INVESTMENTS, LLC,

*Intervenor.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

JESSICA A.B. LIVINGSTON
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
(303) 899-7300

DENNIS H. TRACEY III
MATTHEW DUCHARME
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017
(212) 918-3000

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .......................................................................................................3

    I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN FINDING THAT SANCTIONS DID NOT PROHIBIT PAYMENTS UNDER THE NOTE.............................................................................3

        A.    U.S. Sanctions Expressly Prohibit Any Change to the Terms of Pre-existing Debt...............................................................3

        B.    The Note Is Prohibited New Debt Because the Parties Agreed to Change Its Terms ..............................................................8

    II.    THE DISTRICT COURT CLEARLY ERRED IN FINDING THAT BANKS' INTERNAL RISK POLICIES DID NOT RENDER PAYMENT IMPOSSIBLE ..............................................................13

        A.    PDVSA Satisfied its Burden With Unrebutted Evidence that Citibank, the Only Bank Designated in the Note, Would Not Accept Payment .......................................................16

        B.    PDVSA Proved that Payment Using Banks Other than Citibank was Impossible..........................................................19

    III.    PDVSA DID NOT WAIVE ITS CHALLENGE TO THE DISTRICT COURT'S CALCULATION OF INTEREST ...................................24

CONCLUSION..................................................................................................27

CERTIFICATE OF COMPLIANCE..................................................................28

i

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*300 E. 34th St. Co. v. Habeeb*,
    248 A.D.2d 50, 683 N.Y.S.2d 175 (1997)...........................................14

*Aenergy, S.A. v. Republic of Angola*,
    31 F.4th 119 (2d Cir. 2022) ................................................26

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    17-mc-151-LPS, 2021 WL 129803 (D. Del. Jan. 14, 2021) ................................6

*Health-Chem Corp. v. Baker*,
    915 F.2d 805 (2d Cir. 1990) ........................................15, 21

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ................................................26

*Kama Rippa Music, Inc. v. Schekeryk*,
    510 F.2d 837 (2d Cir. 1975) ................................................15

*Kolodin v. Valenti*,
    115 A.D.3d 197, 979 N.Y.S.2d 587 (1st Dep't 2014) ........................................15

*Loc. 338, RWDSU v. Farmland Dairies, Inc.*,
    No. 02CIV.2705, 2003 WL 1213422 (S.D.N.Y. Mar. 14, 2003)......................15

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008) (per curiam) ........................................25

*Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*,
    No. 19-CV-2519 (PKC), 2021 WL 6092462 (S.D.N.Y. Dec. 22,
    2021) ................................................15

*TNS Media Rsch., LLC v. TRA Glob., Inc.*,
    977 F. Supp. 2d 281 (S.D.N.Y. 2013) ................................................5

*U.S. Fire Ins. Co. v. China Union Lines Ltd.*,
    375 F. Supp. 652 (S.D.N.Y. 1973) ................................................15

## **TABLE OF AUTHORITIES**
### (continued)

**Pages(s)**

*United States v. Gomez*,
   877 F.3d 76 (2d Cir. 2017) ...................................................................26

**Rules**

Fed. R. Evid. 703 ......................................................................................5

**Regulations**

31 C.F.R. § 591.407 ..................................................................................7

83 Fed. Reg. 55,243 ..................................................................................7

**Other Authorities**

E.O. 13808 ........................................................................................*passim*

E.O. 13850 ................................................................................................7

FAQ 553......................................................................................................17

## **PRELIMINARY STATEMENT**

As Defendant-appellant Petróleos de Venezuela, S.A. ("PDVSA") established in its opening brief, the district court erred in awarding final judgment in favor of plaintiff-appellee Dresser-Rand Company ("D-R") because heavy sanctions imposed on PDVSA by the United States Office of Foreign Assets Control ("OFAC") in August of 2017 rendered payment under the parties' note ("Note") and note agreement ("Note Agreement") impossible both because payment was illegal, and because banks were unwilling to stomach the risk of processing a payment from PDVSA given the potential for hefty OFAC fines.

Contrary to D-R's baseless arguments on reply, PDVSA is not trying to exploit the impossibility defense to "evade" its debt obligations. Rather, PDVSA's position is *solely* that its obligations to pay are temporarily suspended *only* so long as the sanctions and related bank risk policies prevent payment. PDVSA does not dispute that once payment becomes possible, it will continue to owe D-R the principal and ordinary interest amounts due under the Note. But in the meantime, D-R should not be allowed to gouge PDVSA with an exorbitantly high default interest rate during an unprecedented humanitarian and economic crisis that has made it impossible for PDVSA to make payments under the Note. D-R's efforts to defend the lower court's indefensible decision are unavailing.

1

First, D-R argues that the parties' agreement to extend the third interest payment did not create prohibited new debt under Executive Order 13808 ("E.O. 13808"). D-R's argument that only "material" changes create new debt finds no support in either the plain text of E.O. 13808 or in any interpretative guidance published by OFAC. D-R's further assertion that the parties did not agree to change the terms of the Note is belied by the mountains of evidence indicating that the parties in fact agreed to change the due date of the third interest payment.

Second, D-R's attempts to demonstrate that payment would have been possible if PDVSA had only tried using other banks ignore the reality that it was D-R's own bank that ultimately refused to accept payment from PDVSA, and any attempts to replace D-R's bank would have required a change to the Note, triggering prohibited new debt. But even if that were not the case, it was not PDVSA's responsibility to find a replacement bank for D-R. D-R cannot fault PDVSA for D-R's own inability to identify an account in which it could receive payments.

Third, D-R's contention that PDVSA has waived its argument against compound default interest ignores the record below and utterly fails to address the merits of PDVSA's argument.

For these reasons and the reasons stated in PDVSA's opening brief, this Court should reverse the district court's judgment against PDVSA, and grant such other and further relief to PDVSA as the Court deems just and proper.

2

# ARGUMENT

## I. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN FINDING THAT SANCTIONS DID NOT PROHIBIT PAYMENTS UNDER THE NOTE

### A. U.S. Sanctions Expressly Prohibit Any Change to the Terms of Pre-existing Debt

Executive Order 13808 prohibits dealings in "new debt." A-1437–1438. According to the express terms of OFAC's Frequently Asked Question 553 ("FAQ 553"), new debt is created whenever the terms of pre-existing debt are changed. A-1479. FAQ 553 places absolutely no limitations on the types of changes that create new debt. *Id.* The only logical interpretation of FAQ 553, therefore, is that *any* change to the terms of a pre-existing debt instrument creates prohibited new debt. D-R, however, relying exclusively on its expert, Stephanie Rice, argues on reply that only "material" changes create prohibited new debt. Resp. Br. at 39–41. But the word "material" does not appear in either E.O. 13808 or FAQ 553. If it was OFAC's view that only material changes are prohibited, it easily could have said so.[1] But it did not. In fact, Ms. Rice conceded at trial that OFAC has never published this supposed materiality requirement anywhere in writing. A-876–877, Tr. 220:25-221:4; A-886, Tr. 230:14-20 (Rice).

---

[1] Indeed, OFAC has imposed such limitations in connection with other sanction regimes. A-996, Tr. 340:5-23 (Barker).

3

The sole basis for D-R's asserted materiality limitation is two undocumented phone calls that Ms. Rice claims to have had with OFAC several years ago. Resp. Br. at 39–40. According to Ms. Rice, during these calls, certain unidentified OFAC agents informed her of an unwritten rule that only material changes create new debt under sanctions regimes similar to E.O. 13808. Resp. Br. at 40; A-787–88, Tr. 131:20-131:2; A-790, Tr. 134:1-11 (Rice). Ms. Rice's testimony about these supposed phone calls with OFAC is unreliable and has no evidentiary value. Ms. Rice was never able to get her story straight as to exactly what OFAC told her during these calls. At her deposition, Ms. Rice testified that OFAC informed her that a formal amendment, which she defined as a signed writing, was required to create new debt. *See* A-884–885, Tr. 228:11-229:14 (Rice). She also testified in her deposition that OFAC did not inform her of any materiality limitation during these phone calls. A-885, Tr. 229:19-25 (Rice). At trial, however, Ms. Rice completely changed her story and testified that during these same two calls OFAC advised her that a change triggering new debt had to be a change to "the underlying material formal terms of the contract," while appearing to abandon her earlier testimony that a separate signed writing was required. A-787–88, Tr. 131:20-132:2; A-790, Tr. 134:1-11 (Rice). Making matters worse, there is no way to check Ms. Rice's recollection of these supposed phone calls because there are no notes or other documents to support or refute her memory. A-886, Tr. 230:9-12 (Rice). In light of

4

Ms. Rice's ever-changing recollection and the absence of any supporting documentary evidence, this Court should not countenance D-R's attempt to use self-serving hearsay testimony to write in a materiality limitation to FAQ 553 where one does not exist. To do so would ignore both fundamental tenets of statutory construction and the Federal Rules of Evidence. *See, e.g.*, *TNS Media Rsch., LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 316 (S.D.N.Y. 2013) ("Under Federal Rule of Evidence 703, 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of [her] testimony.'").

In its reply, D-R further claims that PDVSA's interpretation of FAQ 553—that all changes to pre-existing debt create new debt—is inconsistent with the underlying purpose of sanctions, which, according to Ms. Rice, is to "punish the foreign target" and to "not harm U.S. persons in any way." Resp. Br. at 40; A-774, Tr. 118:5-8. Specifically, D-R contends that OFAC would never have implemented a sanctions regime where a foreign party could simply avoid paying its debts by not paying on time. Resp. Br. at 37–38. This is a strawman. PDVSA has never argued that acceptance of a late payment triggers new debt. In fact, in its opening brief, PDVSA explained that FAQ 553's statement that a "party may collect a payment late without creating new debt" clarifies that the mere acceptance of a late payment does not constitute a change to a debt instrument. Opening Br. at 38. But that is not

what happened here. PDVSA did not make a late payment. To the contrary, here, the parties *mutually* agreed to change the terms of the debt instrument. That is the core definition of "new debt."

Furthermore, the premise of D-R's argument—that sanctions are intended to hurt foreign targets but to not affect U.S. parties—is seriously flawed. While the ultimate purpose of OFAC sanctions may be to punish a foreign target, the means by which that goal is accomplished are often the placement of restrictions on U.S. parties that are enforced by the threat of severe penalties for violations. Indeed, Ms. Rice admitted at trial that she has made an entire career out of helping U.S. entities that are impacted by sanctions. A-757–758, Tr. 101:8-102:8; A-761, Tr. 105:7-25; A-764–767, Tr. 108:7-111:18 (Rice)  The notion that OFAC sanctions cannot be interpreted to result in any harm to a U.S. party is absurd and belied by real world events. For example, while the U.S. government's decision to ban Russian oil and gas imports in the wake of Russia's invasion of Ukraine was intended to punish Russia, a necessary consequence of these sanctions is that Americans have been forced to pay higher gas prices. D-R's collection efforts in this case are another example. U.S. sanctions currently prohibit D-R from enforcing its judgment or attaching any PDVSA assets located in the United States. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,* 17-mc-151-LPS, 2021 WL 129803, at *8 (D. Del. Jan. 14, 2021) ("the current sanctions regime does appear to block issuance of

new writs of attachment on Venezuelan assets in the United States without an OFAC license[.]"); *see also* Exec. Order No. 13850, 83 Fed. Reg. 55,243 (Nov. 1, 2018) (blocking all of PDVSA's "property and interests in property that are in the United States"); 31 C.F.R. § 591.407 (barring the unlicensed "entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked property].").

Against this backdrop, PDVSA's interpretation of FAQ 553 is entirely consistent with the purpose of OFAC sanctions. As explained by Mr. Barker, the purpose of prohibiting any and all changes to the terms of pre-existing debt is to prevent parties from evading sanctions by manipulating the terms of pre-existing debt. A-995–996, Tr. 339:19-340:4 (Barker). Under the scenario contemplated by FAQ 553, if a creditor merely accepts a late payment without reaching an affirmative agreement with the sanctioned debtor, there is no concern that the parties are colluding to avoid sanctions. A-995–996, Tr. 339:19-340:4; A-1015, 359:5-13 (Barker). But where there is an affirmative agreement to change terms, that raises a concern about the possibility of creative sanctions evasion. A-995–996, Tr. 339:19-340:4 (Barker). That is why OFAC created a bright-line rule against any changes to the terms of a debt instrument rather than only to the material terms, which would

interject a degree of subjectivity that could be exploited. D-R cannot credibly argue

otherwise merely by complaining that it has been negatively impacted by this rule.

## B. The Note Is Prohibited New Debt Because the Parties Agreed to Change Its Terms

Based on a straightforward application of FAQ 553, the Note became

prohibited new debt on November 29, 2017, when the parties agreed to change the

due date of the third interest payment from October 20, 2017 to December 29, 2017

(the "November 29 Agreement"). *See* A-1218–1228; A-1281; A-725, Tr. 69:22-24

(Scherzer). The November 29 Agreement not only amended the payment schedule,

but it also made PDVSA current on the Note, meaning that it was no longer in default

and no longer liable for default interest.[2] A-997–999, Tr. 341:25-343:6 (Barker).

Without question, the parties changed the terms of the Note and created prohibited

new debt as a result of this agreement. D-R fails to credibly argue otherwise.

D-R first argues that the November 29 Agreement did not create new debt

because it did not change the length of the overall repayment period. But, as

explained in PDVSA's opening brief, the underlying premise of this argument is

flawed. Opening Br. at 23. FAQ 553 lists a change in the "length of the repayment

period" as just one *example* of a change in terms creating new debt. Both parties

---

[2] D-R tries to muddy the waters by cherry-picking language from a PDVSA letter acknowledging that it would "remedy any delay in the payment of the unpaid interest as soon as possible." A-1221. But as explained in PDVSA's opening brief, the preceding paragraph of this letter makes clear that that is a reference to the interest-only payment that had been missed on October 20, 2017, not to default interest owed. Opening Br. at 26.

agree that the examples provided in FAQ 553 reflect a non-exhaustive list. A-875, Tr. 219:7-14 (Rice); A-994, Tr. 338:15-18 (Barker). Thus, the issue of whether the November 29 Agreement lengthened the repayment period is not dispositive of whether new debt was created. The dispositive question is whether the terms of the Note were changed. When parties agree to extend a payment date—whether it is the first payment, the last payment, or some payment in between—that constitutes a change in the terms of the agreement. D-R's argument that FAQ 553 only prohibits changes to the final payment date but allows changes to intermediate payment dates ignores this reality. And there is no logical reason why OFAC would make this distinction—allowing intermediate dates to be changed would create an obvious loophole where parties could convert periodic payments into one single balloon payment at the end of an existing payment period and avoid sanctions despite the creation of new debt.

D-R's next argument—that the November 29 Agreement was explicitly authorized by the last sentence of FAQ 553—is also flawed. The last sentence of FAQ 553 provides that "U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including PdVSA, pays during the agreed-upon payment period." A-1479. This sentence does not apply to the November 29 Agreement. D-R was not merely accepting a late payment from PDVSA—it was agreeing to an entirely new due date

9

for the third interest payment. The last sentence of FAQ 553 would only apply if, for example, the parties had *not* agreed on a new payment date and then D-R accepted a payment remitted by PDVSA a few months later. In that scenario, D-R would be authorized to accept the late payment, and because the payment was late, PDVSA would be liable for default interest. But that is not what happened here. Instead, as Mr. Scherzer testified at trial, D-R did not want to respond to PDVSA's request by saying "oh, yeah, you're in default," and so it agreed to the "extension." A-729, Tr. 73:9-17; A-730, Tr. 74:14-25; *see also* A-1281. By virtue of that agreement, the due date of the third payment changed and PDVSA was no longer behind on the contractual payment schedule. This is fundamentally different than accepting a late payment and leaving all of the terms of an existing agreement untouched.

D-R tries to get around this fatal defect by claiming that the November 29 Agreement was only an agreement not to declare an Event of Default for an additional 30 days, and because of that, PDVSA remained in default even after the November 29 Agreement. Resp. Br. at 46-50. The evidentiary record lends no support to this argument. Nowhere does either party refer to the November 29 Agreement as a forbearance of D-R's right to call an Event of Default, nor did any

of D-R's fact witnesses describe the agreement as such at trial.[3]  Moreover, agreeing not to declare an Event of Default would not have made any sense at this point in time.  D-R was not *permitted* to declare an Event of Default because it had not yet satisfied the prerequisite steps of putting PDVSA on notice of the default and providing a cure period. A-1093, Art. VII(a).

Lastly, D-R's criticisms of Mr. Barker are meritless.  At trial, Mr. Barker thoroughly explained why OFAC would consider the parties' November 29 Agreement to be a violation of sanctions.  A-997-999, Tr. 341:18-343:6.  Rather than try to meaningfully respond to the merits of his expert opinion, D-R launches a superficial attack using cherry-picked language from Mr. Barker's trial testimony.  For example, D-R suggests that Mr. Barker conceded at trial that his interpretation of sanctions was "counterintuitive."  Resp. Br. at 18.  D-R misconstrues the record.  Mr. Barker only used the word "counterintuitive" to describe the very last sentence of FAQ 553, not his overall reading of E.O. 13808 in light of FAQ 553.  And the meaning of that sentence is not seriously in dispute.  Both experts agree that this

---

[3] D-R points to testimony from Mr. Scherzer stating that PDVSA was already in default when it requested the extension.  Resp. Br. at 46.  But this testimony lends no support to D-R's argument that PDVSA continued to be in default *after* the November 29 Agreement.  D-R's reference to Mr. Barker's testimony acknowledging that default interest automatically applied once PDVSA missed the third interest payment misses the mark for the exact same reason.  Resp. Br. at 49-50.  PDVSA agrees that as of October 20, 2017, when it missed the third payment, it was technically in default and subject to default interest.  The point that D-R misses, however, is that once the parties agreed to the extension of the third payment date, PDVSA was no longer in default and no longer liable to pay default interest because the third interest payment was no longer late.  That constitutes a change in the terms of the Note.

sentence means that late payments on pre-existing debt are permitted. A-781, Tr. 125:14-17 (Rice); A-1001, Tr. 345:10-14 (Barker). They just disagree over how this sentence applies to the facts of this case.

D-R's other argument that Mr. Barker was not willing to testify that any change to the Note would trigger new debt is similarly misleading. Resp. Br. at 53. The fact that Mr. Barker testified that he would consult OFAC if faced with certain extremely minor changes—such as if the administrative agent of the Note changed its address from 10205 Westheimer Road to 10206 Westheimer Road—is consistent with PDVSA's interpretation of FAQ 553 as prohibiting any changes. His testimony was that, as minor as these hypothetical changes were, based on the guidance under FAQ 553, he "wouldn't be comfortable advising somebody that it's not new debt." A-1039-1042, Tr. 383:3-386:14 ("OFAC makes the rules. They say if there is a change in the terms of the agreement, I think they could reach a conclusion that [adding a required notice party is] a change in the terms of the agreement."). In any event, D-R's extreme hypotheticals are irrelevant because here the parties agreed to change the due date of the third interest payment—a significant change. All that is relevant here is that Mr. Barker testified—based on a straightforward reading of FAQ 553—that OFAC would view the November 29 Agreement as a violation of

12

sanctions.  A-983-84.[4]   The district court erred as a matter of law by holding otherwise.

## II. THE DISTRICT COURT CLEARLY ERRED IN FINDING THAT BANKS' INTERNAL RISK POLICIES DID NOT RENDER PAYMENT IMPOSSIBLE

In its opening brief, PDVSA detailed the extensive evidence introduced at trial demonstrating that PDVSA's numerous attempts at payment were unsuccessful because banks were unwilling to assume the risk of processing a payment from PDVSA on the Note.  Opening Br. at 27–41.  PDVSA also pointed out the dearth of countervailing evidence in the record, noting that there was no testimony from any bank representative asserting that any particular bank would have accepted a payment under these circumstances.  Opening Br. at 30.

In response, D-R misstates PDVSA's burden and accuses it of impermissible burden-shifting, arguing that PDVSA "had to prove at trial that every single bank in the world" would have rejected PDVSA's payment to D-R and claiming that PDVSA cannot rely on D-R's lack of evidence to satisfy its burden.  Resp. Br. at 22–36.  These arguments are wrong.

---

[4] The fact that Mr. Barker testified during his deposition that he would take this question to OFAC is of no moment.  After hearing the testimony of Mr. Scherzer at trial, Mr. Barker was able to definitively conclude that OFAC would have required a license for the November 29 Agreement. A-998, Tr. 342:10-20.

As an initial matter, D-R's burden-shifting accusations are misguided. PDVSA accepted, *and met,* its burden of proof to show impossibility based on numerous unsuccessful attempts to make payment, the testimony of bank witnesses about the banks' decisions to reject PDVSA payments due to compliance risk, and expert testimony that such policies were representative of financial institutions generally, which do not wish to take on sanctions risks for processing PDVSA payments. This testimony was not only compelling—it was *unrebutted* by any bank or other witness who was prepared to testify that a bank would process such payments. By pointing out that the testimony was unrebutted, PDVSA was not "shifting the burden"—it was highlighting the strength of its own evidence and the stark absence of any evidence proffered by D-R. This is entirely appropriate.

After a court concludes that a party has met its burden, which PDVSA did here, it is typical to then consider any countervailing evidence that might undermine the court's conclusion, so the party with the burden of proof is well-within its rights to point out evidentiary deficiencies in its adversary's counterarguments. *See, e.g.*, *300 E. 34th St. Co. v. Habeeb*, 248 A.D.2d 50, 55–56, 683 N.Y.S.2d 175, 178 (1997) ("[O]nce appellant produced witnesses whose testimony established the requisite length of residence, the landlord failed to controvert such evidence."). D-R cannot use PDVSA's evidentiary burden to shield itself from criticism. PDVSA agrees that D-R had "no call to bring forward any evidence at all" but also notes that any party

that does not bear the burden and therefore chooses not to bring any evidence "takes a risk in so doing." *U.S. Fire Ins. Co. v. China Union Lines Ltd.*, 375 F. Supp. 652, 654 (S.D.N.Y. 1973). Here, the risk that D-R took in not calling additional bank witnesses or presenting additional evidence manifested itself—PDVSA carried its burden at trial and the record is barren of countervailing evidence.

D-R also misleadingly attempts to set the legal standard for impossibility at a level that is unrealistic and contrary to New York law. The well-established standard for showing impossibility is proof that the defendant "took virtually every action *within its powers*," not proof that the defendant took virtually every action imaginable. *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842 (2d Cir. 1975); *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) (same); *Loc. 338, RWDSU v. Farmland Dairies, Inc.*, No. 02CIV.2705, 2003 WL 1213422, at *4 (S.D.N.Y. Mar. 14, 2003) (same). Accordingly, courts applying this standard have recognized that it does not "require that a party asserting impossibility exhaust every conceivable avenue to perform, including those with only a remote chance of succeeding." *Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, No. 19-CV-2519 (PKC), 2021 WL 6092462, at *6 (S.D.N.Y. Dec. 22, 2021). And courts have rejected arguments that performance under a contract is not impossible where there is some hypothetical way to perform but, "[p]ractically speaking" there is no real-world avenue for performance. *Kolodin v. Valenti*, 115 A.D.3d 197, 201, 979

15

N.Y.S.2d 587 (1st Dep't 2014) (finding performance of recording and management contract to be "objectively impossible" where parties were legally bound not to communicate despite exception for communications through counsel).

Thus, for PDVSA to meet its burden at trial to show impossibility, it needed to show that it took every **practical, realistic** action **within its powers** to meet its payment obligation under the Note. PDVSA did just that. As detailed in its opening brief and below, PDVSA proffered substantial evidence—despite its lack of access to its own records—that payment was impossible because Citibank—the only bank allowed to accept payment under the Note—refused to continue processing payments, the parties could not replace Citibank without amending the Note Agreement and creating prohibited new debt, and even if they could, no bank was willing to replace Citibank in light of the high-stakes risks involved.

## A. PDVSA Satisfied its Burden With Unrebutted Evidence that Citibank, the Only Bank Designated in the Note, Would Not Accept Payment

It is undisputed that the express terms of the Note Agreement allowed PDVSA to wire payments to D-R's Citibank account and to that account only.[5] *See* PDVSA Br. at 33–34; A-560; A-1076; A-1116. At trial, PDVSA submitted unrebutted evidence that Citibank had adopted a risk appetite policy under which it would not

---

[5] D-R argues that PDVSA could have also paid by check, but at trial, D-R admitted that it would have tried to deposit any check received by PDVSA into the very same Citibank account. A-673, Tr. 17:8-12; A-718, Tr. 62:4-10 (Scherzer).

process any transactions with PDVSA that were not preauthorized. A-805, Tr. 149:15-21 (Romano). And PDVSA solicited testimony from both Citibank and D-R that D-R never completed the preauthorization process, thus *guaranteeing* that no payment from PDVSA to D-R's Citibank account would ever be processed. A-715, Tr. 59:8-17 (Scherzer); A-806, Tr. 150:3-13 (Romano). This evidence unmistakably showed that it was impossible for PDVSA to transfer a payment into D-R's Citibank account, thus rendering it impossible for PDVSA to perform its payment obligation as required by the Note.

In the face of this evidence, D-R concedes, as it must, that payment to Citibank was impossible, but it ignores the impact of that conclusion, which is that payment to any bank became impossible. D-R contends that Citibank's refusal to serve as D-R's recipient bank under the Note did not render payment impossible because some number of other banks could have replaced Citibank. D-R's argument is fatally flawed. If PDVSA wanted to remit payment to another bank, that would have required an amendment to the Note Agreement replacing Citibank as D-R's designated bank account. Under any interpretation of E.O. 13808 and FAQ 553, changing the recipient bank account in the Note Agreement would constitute a change in terms creating prohibited new debt. Indeed, such an amendment, especially from a U.S.-based bank like Citibank to a foreign bank like Commerzbank or Novo Bank, is exactly the type of change that OFAC would prohibit given the

17

potential for sanctions evasion and abuse associated with re-directing the flow of money ultimately bound for a U.S. entity. A-1013–1014, Tr. 357:23-358:19. Accordingly, PDVSA satisfied its burden to establish that payment was impossible based solely on these facts, which D-R cannot credibly dispute: (1) Citibank was the only bank that could accept payment under the Note; (2) Citibank refused to continue accepting payments from PDVSA; (3) in order for PDVSA to pay a different bank, the terms of the Note Agreement would need to be changed; and (4) any such change would create prohibited new debt under the plain terms of FAQ 553. The district court committed clear error in finding that PDVSA failed to meet its burden by not submitting evidence to establish that no bank in the world would have processed payment for PDVSA. Replacing Citibank with any other bank was not a viable option. While PDVSA also submitted substantial evidence to establish that no other bank would have processed a PDVSA payment, that evidence was not necessary to satisfy its burden.

Citibank's refusal to continue processing payments also extinguishes D-R's claim that November 29, 2017—the date of the parties' agreement to extend the third interest payment deadline—is the earliest possible date in which PDVSA can claim impossibility. Resp. Br. at 23–24. The facts proven by PDVSA at trial show that payment became impossible as soon as Citibank adopted its internal policy barring PDVSA payments that were not preauthorized. At trial, the representative from

18

Citibank, Raymond Romano, testified that Citibank adopted this policy "in advance of any sanction requirements," A-805, Tr. 149:15-21 (Romano), which means that Citibank adopted the policy sometime before August 25, 2017, when E.O. 13808 went into force. A-1437. PDVSA also introduced into evidence an email, dated September 25, 2017, from Citibank to Siemens, D-R's parent company, announcing the new policy and providing information about the preauthorization process. A-1263. Thus, the record is clear that by, at the latest, September 25, 2017, nearly a month before the third interest payment was due on October 20, 2017, Citibank would not serve as a recipient bank for any payment under the Note. And even if it could be said that Citibank might have processed the payments if D-R completed the necessary paperwork, the fact remains that D-R did not do so, A-715, Tr. 59:8-17 (Scherzer); A-806, Tr. 150:3-13 (Romano), and so for PDVSA, payment to Citibank, the only available recipient bank, was impossible.

**B.    PDVSA Proved that Payment Using Banks Other than Citibank was Impossible**

As detailed in PDVSA's opening brief, even if this Court finds that changing the Note Agreement to replace Citibank with another recipient bank would not violate E.O. 13808, PDVSA still proved impossibility because it established at trial that no other bank was willing to assume the risk of processing a payment from PDVSA under the Note Agreement. Opening Br. at 27–41.

D-R's argument that PDVSA cannot satisfy its burden to show that it took virtually every possible action to perform with three "meager" attempts to pay is wrong on both the facts and the law. To start, an international wire transfer, such as a payment from PDVSA to D-R, typically requires the participation of several banks—an originating bank (PDVSA's bank), one or more intermediary banks, and a recipient bank (D-R's bank)—in order to successfully process a single payment. As explained at trial by Mr. Barker, when "an originating bank and a beneficiary bank [] do not have any type of direct relationship," an intermediary bank becomes "necessary to facilit[ate] the processing of a transaction." A-842, Tr. 186:20-23 (Barker). If any one of the banks refuses to remit payment, the whole chain breaks, and the payment fails. That is what happened to each of PDVSA's three rejected payment attempts. The first two attempts were successfully sent from one of PDVSA's originating banks, but then were rejected by an intermediary bank. The third attempt made it from PDVSA's originating bank through an intermediary bank, but was then rejected at its final destination, D-R's account at Citibank. D-R's argument that processing of the payment by one bank in the chain somehow proves that payment was possible ignores the reality that *every* bank in the chain must process the payment in order for the payment to be successful. And, critically, it is undisputed that the last bank in the chain—Citibank—would not process a payment.

D-R's argument that PDVSA needed to make many more payment attempts to satisfy its burden assumes that PDVSA could have simply sent wire transfers to every bank in the industry and hoped that one would accept it on behalf of D-R. This is not the case. Before PDVSA could attempt payment, D-R would have to open up an account at the bank, which, as D-R admitted at trial, is a "labor-intensive process" that can take several months. A-690, Tr. 34:19-25 (Scherzer); A-720-721, Tr. 64:24-65:2 (Scherzer). Needless to say, in the world PDVSA faced in 2017-18 with constantly expanding sanctions, establishing a new banking relationship was not realistic. Against this backdrop, PDVSA's three payment attempts were far from meager, they were everything that PDVSA could have done until D-R identified a viable replacement for Citibank. PDVSA thus satisfied its burden to take "virtually every action *within its powers*" to make payment. *Baker*, 915 F.2d at 810.

PDVSA even went above and beyond its obligations by trying to actively work with D-R to identify a replacement bank. The parties identified two potential options—Commerzbank and Novo Bank—but as explained in PDVSA's opening brief, neither turned out to be viable options. Opening Br. at 36-41. D-R argues that payment was still not impossible because there were other banks that previously processed payments for PDVSA either as an originating bank or intermediary bank—China CITIC, Dinosaur Merchants Bank Limited, and JPMorgan—that could have been used. But D-R fails to explain how PDVSA could have sent payments to

these banks without D-R holding accounts at them or otherwise letting PDVSA know that they were options. The evidence at trial shows that PDVSA attempted to transfer the third interest payment into every account owned by D-R of which it was aware. PDVSA even made the suggestion that D-R open up an account at Novo Bank in February of 2018, but D-R did not successfully do so until October 23, 2018—a full seven months later. A-1414. By then, so much time had elapsed that D-R did not even bother to tell PDVSA that it had finally opened an account. A-691, Tr. 35:6-9 (Scherzer). Ultimately, while D-R tries to ignore that PDVSA was only obligated to take all actions "within its power" to perform, it cannot blame PDVSA for its failure to replace its own bank.

PDVSA also conclusively established that no bank would have had the risk appetite to process a payment from PDVSA under the Note, especially in light of the November 29 Agreement. At trial, PDVSA's expert explained that Citibank, D-R's own bank, which, of any bank, would have the most interest in finding a way to process a large payment to one of its key clients, was not willing to assume the risk of processing a payment from PDVSA under the circumstances. A-1009, Tr. 353:9-19 (Barker). PDVSA further showed, and D-R did not contest, that Deutsche Bank, which served as the intermediary bank for PDVSA's first attempt to make the third interest payment, was unwilling to assume the risk of processing a payment from PDVSA to a non-client without a clear indication of the payment's purpose.

On reply, D-R tries to downplay this evidence by arguing that there is "no evidence that the two policies are representative of the financial industry as a whole." Resp. Br. at 25. In making this argument, D-R ignores Mr. Barker's detailed explanation of how the policies of Citibank and Deutsche Bank reflect an industry-wide reluctance to process transactions from PDVSA due to banks' aversion to sanctions risks, as well as other reputational risks associated with processing payments for sanctioned parties. A-1007–1008, Tr. 351:11-352:11; A-1009, Tr. 353:23-354:5 (Barker). Mr. Barker explained the risk calculus that banks undertake in establishing their risk appetite policies—on the one hand, banks make very little money from processing wire transfers, and on the other hand, banks risk incurring millions of dollars in fines if they inadvertently violate a sanctions order. A-990–991, Tr. 334:24-335:14; A-1007–1008, Tr. 351:25-352:11 (Barker). Based on these considerations, most banks, according to Mr. Barker, were "very reluctant to process transactions involving PDVSA at the time, particularly given everything that was going on in Venezuela." A-1008, Tr. 352:9-11 (Barker).

D-R further tries to dispense with the Citibank and Deutsche Bank policies by making the baseless claim that they are "unique" in the industry and only demonstrate that policies greatly vary among banks. But Citibank's policy and Deutsche Bank's policy are not that dissimilar, especially in relation to how they treated the payments at issue here. Both policies call for the rejection of payments

from PDVSA to non-clients when the purpose is unclear, both require additional due diligence to determine the purpose and permissibility of the payments from PDVSA to clients, though they do so at different times, and, under both policies, PDVSA's attempt to transfer the third interest payment to D-R was rejected as too risky. A-805, Tr. 149:15-21 (Romano); A-1899. These policies are also similar to the risk appetite policy of Commerzbank, which, as detailed in PDVSA's opening brief, limited the processing of PDVSA payments with indications of a connection to the United States financial system. *See* Opening Br. 40-41; A-1895; A-1051, Tr. 395:1-22 (Barker). In light of all the evidence submitted at trial, PDVSA established that Citibank's and Deutsche Bank's policies are not unusually restrictive policies, but rather reflect the industry standard that made payment impossible here.

## III. PDVSA DID NOT WAIVE ITS CHALLENGE TO THE DISTRICT COURT'S CALCULATION OF INTEREST

In its opening brief, PDVSA established that the district court committed error when it ignored the plain terms of the Note Agreement and awarded compound default interest both before and after judgment. Opening Br. at 41–47. In response, D-R does not dispute the merits of PDVSA's interest calculation. Instead, D-R's sole argument on reply is that PDVSA waived this argument by failing to raise it below. But what D-R fails to mention is the reason that the interest calculation was not raised below, which is that the parties agreed upon the interest rates in advance

of trial and it was only after the entry of judgment that PDVSA determined that D-R did not faithfully apply the parties' agreement.

In advance of trial, the parties agreed upon certain findings of fact that were filed with and so-ordered by the district court. A-556–576. One such agreed finding of fact was that under the Note and Note Agreement, PDVSA agreed to pay D-R the principal sum of the Note, ordinary interest on unpaid principal, and "on any overdue payment of principal and any overdue payment of interest, default interest, payable on demand, based on and computed on the basis of 365 days, at a rate per annum equal to 8.5%." A-557. In light of this agreement, the mechanics of the interest calculation were hardly mentioned at trial. D-R submitted almost no evidence supporting or describing its interest calculation beyond a very high-level explanation provided by Mr. Scherzer. A-702, Tr. 46:10-20 (Scherzer). D-R did not further describe its calculation in its post-trial briefing. Against this backdrop, PDVSA did not discover that D-R did not faithfully apply the parties' agreement on the calculation of interest until after the entry of judgment.

This Court has the discretion to entertain new arguments on appeal. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (per curiam). The Court will generally "exercise this discretion to consider an otherwise forfeited argument where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding," and

where the party proffers a reason for its failure to raise the argument below. *United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017) (internal citation omitted); *see also Jackson v. Abernathy*, 960 F.3d 94, 98 n.1 (2d Cir. 2020) (considering merits of new argument on appeal where the issue presented "a question of law and there [wa]s no need for additional fact-finding."); *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 126 n.10 (2d Cir. 2022) (same). Thus, where an argument involves a pure question of law, there is a need to prevent an injustice, and there is an understandable reason for the party's failure to raise it below, this Court will often exercise its discretion to consider the argument's merits.

PDVSA's interest rate argument falls squarely into this category. It is, as detailed in PDVSA's opening brief, a pure question of law that requires no additional fact-finding, just interpretation of the contract that is at the core of this case and already before this Court. Opening Br. at 41. There is a need to prevent D-R from misinterpreting the contract to obtain a windfall in the form of interest-upon-interest. *See* Opening Br. at 42 (detailing New York public policy against interpreting "per annum" interest rates as compound unless clearly stated). And it is understandable that PDVSA did not raise the matter below because the parties had agreed to the interest rates and PDVSA only discovered that the agreement was not faithfully applied after the entry of judgment. Under these circumstances, PDVSA

respectfully requests that this Court exercise its discretion to reach the merits of this issue.

## CONCLUSION

For all of the foregoing reasons, this Court should reverse the district court's final judgment award against PDVSA, and grant such other and further relief to PDVSA as it deems just and proper.

Dated:  August 11, 2022

/s/ Dennis H. Tracey, III
Dennis H. Tracey, III
Matthew Alan Ducharme
Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
(212) 918-3000

Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
(303) 899-7300

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,622 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

<u>/s/ Dennis H. Tracey, III</u>